*The Honorable Richard A. Jones*

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BRIAN A. GLASSER, AS TRUSTEE OF
THE YELLOWSTONE CLUB
LIQUIDATING TRUST,

                 Plaintiff,

    v.

JESSICA BLIXSETH, individually, the
marital community of JESSICA T.
BLIXSETH and TIMOTHY L. BLIXSETH,
and JTB, LLC, a Washington limited liability
company, and CHERRILL B. FERGUSON,
individually, and the marital community of
CHERRILL B. FERGUSON and JOHN DOE
FERGUSON,

                 Defendants.

Case No. 2:14-cv-01576-RAJ

**DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT**

**NOTE ON MOTION CALENDAR:**

**Friday, January 15, 2016**

## I.    INTRODUCTION AND RELIEF REQUESTED

Plaintiff is asking this Court to enter summary judgment on Plaintiff's First Claim for Relief and on the "good faith/reasonably equivalent value" defense asserted by Defendants on Plaintiff's remaining causes of action.

Plaintiff's First Claim for Relief asserts that the transfer of the membership interests in Western Air & Water LLC (hereafter "WAW") and Kawish LLC (hereafter "Kawish") by

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

Timothy Blixseth to Desert Ranch Limited Liability Limited Partnership (hereafter "DRLLLP") were fraudulent conveyances.  The remaining causes of action assert that JTB LLC (hereafter "JTB") was either an initial or subsequent transferee from DRLLLP of those same membership interests; *see Glasser 9/4/15 testimony at 11:15-21; Brain Dec. Ex. 1 (DKT 175-1)*, and that Jessica Blixseth was a subsequent transferee from JTB.[1]

Generally, in order to recover from a subsequent transferee the trustee must first avoid the transfer of the debtor's interest to the initial transferee avoided.  In re Slack-Horner Foundries Co., 971 F.2d 577, 580 (10th Cir. 1992).  So, Plaintiff has to prove that the transfer of the membership interests into DRLLLP was a fraudulent transfer in order to challenge any subsequent transfer.

However, Plaintiff's First Cause of Action asserts exactly the same claims based on the "Desert Ranch Transfers" which Plaintiff also asserts in *Kirschner v. Desert Ranch LLLP (In re Yellowstone Mountain Club, LLC)*, Chapter 11 Case No. 08-61570-11, Adv. Proc. No. 10-00015 (Bankr. D. Mont., Feb. 19, 2010) (hereafter "AP 15").  In sum, Plaintiff seeks judgment on claims which were already being litigated in another jurisdiction and in fact have been referred for trial.

Plaintiff's initiation of claims in multiple jurisdictions violates a prohibition on duplicative actions; Curtis v. Citibank, N.A., 226 F.3d 133, 138 (2d Cir. 2000), and imposes a fundamentally unfair burden on Jessica Blixseth.  DRLLLP is a necessary party to any action seeking to avoid the transfer of the membership interests from Timothy Blixseth to DRLLLP. Plaintiff should be compelled to complete the litigation of this issue in the forum it originally chose before its claims against Defendants here are addressed.

With respect to Plaintiff's remaining claims, what Plaintiff is really complaining about is that, as a result of the transfer of the WAW membership units to JTB, when the actual assets of

---

[1] The fundamental problem with this claim is that the membership interests were not subsequently transferred. Those interests have remained vested in JTB LLC since the initial transfer in April 2013.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT – Page 2
(Cause No. 2:14-cv-01576-RAJ)

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

WAW were sold, the proceeds were distributed through JTB as the member of WAW, to

Jessica Blixseth as the member of JTB:

> The essential question was, how, then, does it harm me for her [Jessica Blixseth
> as the sole member of JTB LLC] to have the LLC interest. And I am saying
> because the distribution of the money goes not to the debtor, it goes to some
> alleged stranger to the debt, and goes away. That's how it harms me.

*(Glasser 9/4/15 testimony at 23:18-22; Brain Dec. Ex. 1 (DKT 175-1))*.  Plaintiff's claim is

focused on the sale of WAW assets in 2014.  In focusing on the distribution of the sales

proceeds, Plaintiff is focusing on the wrong transaction and the wrong time period.

The wrong transaction because Plaintiff's claims are based on alleged subsequent

transfers of the membership interests which have never occurred.  The wrong time because both

"reasonable equivalence;" In re Floyd, 540 B.R. 747, 758 (Bankr. D. Idaho 2015), and "good

faith;" In re O'Connell, 119 B.R. 311, 317 (Bankr. M.D. Fla. 1990) are measured as of the time

of transfer, in this case, April of 2013, not October of 2014.

"Questions of good faith may generally be difficult to establish on summary judgment;"

In re Agric. Research and Tech. Group, Inc., 916 F.2d 528, 539 (9th Cir. 1990), because good

faith is an issue of fact. *Id.*  "Reasonable equivalence" is likewise an issue of fact.  In re Heilig-

Meyers Co., 297 B.R. 46, 52 (Bankr. E.D. Va. 2003).

In overview, the principal fact on which Plaintiff relies for the proposition that

Jessica Blixseth's receipt of the membership interests was not in good faith is the fact that

Jessica Blixseth is married to Timothy Blixseth:

> You can't play in mud and not get dirty.  That's what she's done.  She's played in
> his mud pile, and she's dirty because of it.

*(Glasser Dep. at 61, Ex. 2 to Brain Dec. (DKT 175-2))*.  Character assassination by association.

However, it is undisputed that the transactions which are the ultimate basis of Plaintiff's claims

here, the distribution of Credit Suisse loan proceeds and the creation of the DRLLLP holding

company structure, all took place before Jessica Blixseth's marriage to Timothy Blixseth.  It is

undisputed that Jessica Blixseth had no involvement in these transactions of any kind.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT – Page 3
(Cause No. 2:14-cv-01576-RAJ)

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

In terms of the evidence that Plaintiff offers for Jessica Blixseth's knowledge of facts that would create a duty of inquiry, what little *actual* evidence Plaintiff offers relating to the operative time period, is either not material or disputed and, in any case would not be legally sufficient to trigger a duty of inquiry.

As an example, take the contention that Jessica Blixseth was aware of the judgment in AP 14 by virtue of having attended the second phase trial. "Mere knowledge by a grantee of pre-existing judgments against the grantor does not constitute "knowledge of facts and circumstances naturally and justly calculated to excite suspicion in the mind of a person of ordinary prudence, and which would naturally prompt [the grantee] to pause and inquire about consummating the transaction...." 37 C.J.S. *Fraudulent Conveyances* § 126, at 957 (1943)." Fick v. Perpetual Title Co., 115 Md. App. 524, 544, 694 A.2d 138, 148 (1997).

That Jessica Blixseth attended the trial is in dispute. (*See Flynn Dec. DKT 127 at ¶ 2*). The Ruling in AP 14 was issued 6 months after the trial. Mr. Glasser admitted that he has no evidence showing that Jessica Blixseth was aware of the ruling. (*Glasser Dep. at 28-30, Brain Dec. Ex. 2 (DKT 175-2)*).

With respect to "reasonably equivalent value:

"There is no bright line rule used to determine when reasonably equivalent value is given." "A determination of reasonably equivalent value is 'fundamentally one of common sense, measured against market reality.' "When evaluating a transfer for reasonable equivalency under 11 U.S.C. § 548(a)(1)(B)(I) a court must examine the entire situation."

In re Schultz, 368 B.R. 832, 836 (Bankr. D. Minn. 2007). Again, assets transferred from DRLLLP to JTB was not the assets held by either WAW or Kawish but the membership interests in each held by DRLLLP. The question here is: What was the market reality as to the value of the membership interests as of the date of transfer? The answer is probably nothing.

The "common sense" "market reality" here was that in AP 15, Plaintiff was attempting to extend the judgment it obtained in AP 14 to all 20+ sub-entities under the DRLLLP structure, all of which were Timothy Blixseth's separate property under the Premarital Agreement. Likewise, the claims made in the litigation involving Wayne Prim were directly against DRLLLP assets.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT – Page 4
(Cause No. 2:14-cv-01576-RAJ)

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

The pool of assets held by DRLLLP that DRLLLP was trying to protect involved many tens of millions of dollars worth of assets, not just the residence but the WPT membership units as well as the Overlook lots. Neither DRLLLP nor any of the subsidiary entities would have any value if Plaintiff or Prim were successful and, it is undisputed that the existence of the litigation had rendered DRLLLP illiquid and incapable of funding the litigation, as well as funding the expenses necessary to maintain the assets.

While Plaintiff contends the terms of Jessica Blixseth's agreement are unclear, the undisputed fact is that Jessica Blixseth has expended $941,912.95 on litigation expenses which has unquestionably inured to the benefit of DRLLLP. To conclude that providing litigation funding absolutely necessary to preservation of any value in DRLLLP defies common sense.

## II. EVIDENCE RELIED UPON

This Response relies upon the Declaration of Paul E. Brain (*Brain Dec. DKT 175*) and the Declaration of Jessica F. Blixseth (*J. Blixseth Dec. DKT 174*) filed herewith, and the records and files herein.

## III. STATEMENT OF FACTS

A.   Plaintiff's First Cause of Action is Duplicative of AP 15:   Plaintiff's First Cause of Action concerns what Plaintiff characterizes as the "Desert Ranch Transfers," specifically the transfer of membership interests in various limited liability companies into Desert Ranch Limited Liability Limited Partnership ("DRLLLP"). As Plaintiff states at ¶ 45 of the Verified Third Amended Complaint:

> Among the assets Mr. Blixseth transferred to Desert Ranch in the days leading up to and after the Debtors' bankruptcy filing were all of his direct or indirect ownership interests in the entity, and/or the assets of (a) that entity, known as Western Air & Water LLC, an Oregon limited liability company and (b) that entity, known as Kawish, LLC, a Washington limited liability company (the "Desert Ranch Transfers").

(*DKT 147*). Plaintiff goes on to make the following allegations:

> In the midst of the aforesaid trial [of AP 14], the Trust became aware of the Desert Ranch Transfers and commenced a separate adversary proceeding against Desert Ranch, Mr. Blixseth, and others seeking to recover the Desert Ranch Transfers as fraudulent transfers pursuant to Sections 544(b), 548, and 550 of the

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT – Page 5
(Cause No. 2:14-cv-01576-RAJ)

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

1    Bankruptcy Code and the Montana Uniform Fraudulent Transfer Act.  That
     action is styled Kirschner v. Desert Ranch LLLP (In re Yellowstone Mountain
2    Club, LLC), Chapter 11 Case No. 08-61570-11, Adv. Proc. No. 10-00015 (Bankr.
3    D. Mont., Feb. 19, 2010)[AP 15].   The complaint initiating the Desert Ranch
     fraudulent transfer action explicitly seeks to avoid and recover, as fraudulent
4    transfers, the Western Air & Water ownership interests and assets Mr. Blixseth
     transferred to Desert Ranch.
5

6         Read together, Plaintiff acknowledges AP 15 includes claims asserting that the transfer

7    of the limited liability company membership interests in WAW and Kawish was a fraudulent

8    conveyance.   This is the same claim asserted here: "The Desert Ranch Transfers from

9    Mr. Blixseth to Desert Ranch constitute fraudulent transfers under Sections 31-2-333 and 31-2-

10   334 of the Montana Code Annotated or otherwise applicable state fraudulent transfer laws."

11   (*DKT 147 at ¶ 87*).    The transferor in each Desert Ranch Transfer is alleged to be

12   Timothy Blixseth.   The transferee in each Desert Ranch Transfer is DRLLLP.   Plaintiff here

13   asserts the same avoidance remedy against DRLLLP which is not a party. "The Desert Ranch

14   Transfers can be avoided as to Desert Ranch by Mr. Blixseth's creditors under Section 31-2-

15   339(1)(a) of the Montana Code Annotated or under otherwise applicable state fraudulent transfer

16   laws."  (*DKT 147 at ¶ 91*).  So, Plaintiff has asserted the same claims in 2 separate lawsuits,

17   without joining either Timothy Blixseth or DRLLLP here.

18        AP 15 was originally set for trial in the Montana Bankruptcy Court but, was referred

19   back to the District Court because one defendant demanded a jury.  On July 29, 2015, the matter

20   was referred to the District Court for trial.  As the Order referring the matter notes, all of the pre-

21   trial deadlines have passed. (*See App. 1 attached hereto*).  So, the matter is fully ready for trial

22   in Montana.

23        Other than funding the AP 15 litigation expenses after April 2013, Jessica Blixseth had

24   no involvement in the original transactions and has had no involvement in AP 15.

25   Timothy Blixseth, who would be a principal witness on Defendants' behalf, has been

26   incarcerated in Montana since April 2014 and only able to assist in the defense here on a very

27   limited basis.

28

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT – Page 6
(Cause No. 2:14-cv-01576-RAJ)

B.    <u>Facts Relating to Good Faith:</u>   Probably the only undisputed fact relied on by Plaintiff here is the fact that Jessica Blixseth was married to Timothy Blixseth the significance of which was summarized by Mr. Glasser as follows:

> You can't play in mud and not get dirty.  That's what she's done.  She's played in his mud pile, and she's dirty because of it.

*(Glasser Dep. at 61, Brain Dec. Ex. 2 (DKT 175-2)).*  This is a theme which runs consistently through Mr. Glasser's testimony and this Motion, that the marital relationship by itself is enough to defeat any good faith on the part of Jessica Blixseth.  As another example, when asked the basis for the assertion that Jessica Blixseth was aware of the injunction prohibiting the sale of the Tamarindo Resort, Mr. Glasser stated: "It is likely the case a normal human being who receives an injunction that prohibits him from selling the place where he is residing with his wife would tell her."  *Id at 76.*  On being pressed, Mr. Glasser admitted he actually had no evidence that Jessica Blixseth was aware of the injunction.  *Id at 77.*  In other words, Mr. Glasser is speculating.

As Defendants understand Plaintiff's Motion on good faith, Plaintiff relies on the testimony at the September 4, 2015 hearing as a principal basis for this Motion.  Plaintiff actually cites only to this Court's interlocutory ruling and not the actual testimony. *(Motion at 13:19-14:4).*  There was in fact testimony by both Jessica Blixseth and Mr. Glasser bearing on the issue of good faith.  Mr. Glasser summarized his knowledge of the evidence on this issue as follows:

> Q. Okay. Let me ask you this: Your contention is that Mrs. Blixseth was fully aware of all the liabilities carried by Mr. Blixseth, correct?
>
> A. No. My contention is Mrs. Blixseth was aware that there was an injunction on for Tamarindo. She was aware that Tamarindo sold, because she didn't go down there and live anymore. She was aware that there was a creditor protection vehicle called Desert Ranch that included Kawish and Western Air & Water, which includes the house in Medina and the boats and the plane, and she was aware that the structure was used to keep creditors like the Yellowstone Trust, the State of California, and the State of Montana away. There is no question she -- she was aware of that. They physically lived on the Tamarindo property from time to time. She must know when it was sold. We'll found out when she testifies.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT – Page 7
(Cause No. 2:14-cv-01576-RAJ)

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

1    Q. But you don't have any evidence to offer on any of that at this point in time?

2    A. I do not.

3    *(Glasser 9/4/15 testimony at 24-25; Brain Dec. Ex. 1 (DKT 175-1)).*

4    The situation has not changed particularly.  For example, with respect to the sale of the

5    Tamarindo Resort and the violation of the injunction, Plaintiff's evidence that Jessica Blixseth

6    had knowledge of the injunction is as follows:

7    Q. If I understood correctly, other than the injunction itself, which I just heard
     you say you believe is evidence of Mrs. Blixseth's knowledge, and the fact that
8    Mrs. Blixseth was married to Mr. Blixseth, you have no documentary evidence
     and no percipient witness who will testify as to Mrs. Blixseth's actual knowledge?
9

10   A. Okay.  No, I just -- the answer to that question is no.

11   *(Glasser Dep. at 75:11-19, Brain Dec. Ex. 2 (DKT 175-2)).*  Mr. Glasser's answer to the

12   question of what evidence Jessica Blixseth had that the resort was being sold is similar: "It's the

13   fact that she's the wife; that she was integral into his life; that she knew -- I mean, it's the kind of

14   full-bodied picture of a wife and husband using these assets until such time as he illegally sold

15   them." *(Glasser Dep. at 52:5-9, Brain Dec. Ex. 2 (DKT 175-2)).*

16   The  common  theme  here  is  that  because  Jessica  Blixseth  was  married  to

17   Timothy Blixseth,  it  is  reasonable  to  infer  that  Jessica  Blixseth  would  be  privy  to

18   Timothy Blixseth's financial dealings.  Plaintiff asserts that the existence of a "confidential

19   relationship" arising from the marriage imposed a greater duty on Jessica Blixseth.  However,

20   Jessica Blixseth executed a Premarital Agreement pursuant to which she waived any right to

21   information relating to Timothy Blixseth's financial affairs.  *(J. Blixseth Dec., Ex. 1 (DKT 174-*

22   *1) and DKT 171, Ex. 1).*  Jessica Blixseth did not in fact have a right to make inquiry and

23   Timothy Blixseth had no obligation to make disclosure.  So, whatever relationship might exist

24   otherwise, there was no "confidential relationship" insofar as Timothy Blixseth's financial

25   affairs  are  concerned  and  Jessica  Blixseth  had  no  right  to  direct  or  participate  in

26   Timothy Blixseth's dispositions of his separate property.

27

28

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT – Page 8
(Cause No. 2:14-cv-01576-RAJ)

**BRAIN LAW FIRM PLLC**
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

Plaintiff asserts that Jessica Blixseth's awareness that Timothy Blixseth was involved in litigation would have triggered a duty of inquiry. The basis for this statement appears to be testimony on September 4, 2015 by Jessica Blixseth that she was aware that Plaintiff "wanted money from him" [Timothy Blixseth]. (*J. Blixseth 9/4/15 testimony at 55:15; Brain Dec. Ex. 1 (DKT 175-1)*). To begin with, "mere knowledge by a grantee of pre-existing judgments against the grantor does not constitute "knowledge of facts and circumstances naturally and justly calculated to excite suspicion in the mind of a person of ordinary prudence, and which would naturally prompt [the grantee] to pause and inquire about consummating the transaction...." 37 C.J.S. *Fraudulent Conveyances* § 126, at 957 (1943)." <u>Fick v. Perpetual Title Co.</u>, 115 Md. App. 524, 544, 694 A.2d 138, 148 (1997).

The statement also appears to be based on testimony that Jessica Blixseth attended some unspecified portion of Phase 2 of the AP 14 trial. Both the fact of Jessica Blixseth's attendance and the inference drawn by Mr. Glasser that this would have put Jessica Blixseth on notice of Plaintiff's claims are in dispute. Timothy Blixseth's lawyer in AP 14 has testified:

> The trial in this matter went forward in 2 phases. The first phase occurred in May 2009 and involved issues pertaining to the transactions involving Credit Suisse. Jessica Blixseth was present in the courtroom briefly in Phase 1. Phase 2, which involved claims between Mr. Blixseth and the debtor, commenced on February 26, 2010. To my certain knowledge, Jessica Blixseth did not attend any portion of the Phase 2 trial. The opinion on Phase 2 was not actually issued until August of 2010. So, even if Mrs. Blixseth had attended the hearing, which she did not, it would not have put her on notice of the outcome. It is equally my opinion that a non-lawyer listening to the proceeding would have had a very difficult time understanding what was at issue.

(*DKT 127 at ¶ 2*). The Ruling in AP 14 was issued 6 months after the trial. Mr. Glasser admitted that he has no evidence showing that Jessica Blixseth was aware of the ruling. (*Glasser Dep. at 28-29, Brain Dec. Ex. 2 (DKT 175-2)*). The judgment in AP 14 was for $41 million. When Jessica Ferguson Kircher married Timothy Blixseth, as stated in the premarital agreement, Timothy Blixseth was worth $1 billion. Would a finder of fact be entitled to infer that a judgment equal to 4% of his net worth would trigger a duty of inquiry?

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

Plaintiff asserts that Jessica Blixseth lacked good faith because "she read some media articles relating to the Yellowstone Club…" (*Motion at 15*). Plaintiff's deposition testimony on the same subject:

> Q. Do you have any knowledge as to what information she actually read?
>
> A. No.  My only inference from that is that she obviously was reading some of the press reports.
>
> Q. So you don't actually know whether the press reports she was reading relate to the issues that we're dealing with here?
>
> A. Correct.

(*Glasser Dep. at 29:25-30:8, Brain Dec. Ex. 2 (DKT 175-2)*).   Plaintiff doesn't even offer examples of what media articles Jessica Blixseth might have seen.

Plaintiff asserts that Jessica Blixseth was under a duty of inquiry at 2 different levels. First, Plaintiff asserts that Jessica Blixseth was under a duty of inquiry as to the litigation. However, it is undisputed that Jessica Blixseth did make inquiry of Timothy Blixseth and was informed that there were no issues to be concerned about.  Jessica Blixseth's testimony in this regard was as follows:

> Q. How much do you know about what's going on in the Yellowstone Mountain Club bankruptcy proceedings?
>
> A. Have you ever heard the term "ignorance is bliss?" I used to read articles --
>
> Q. Okay.
>
> A. -- and then every time I spoke to Tim about them, he would immediately say, you can't believe anything you read particularly from Matt Brown and that everything was on appeal.  And he had a plan and everything would be worked out, and you'll see.
>
> Q. And did you just stop asking him at some point?
>
> A.  I didn't see any reason not to believe him.
>
> Q. Did you continue to ask about it?
>
> A. On occasion.
>
> Q. Okay.
>
> A. But our life never changed.

(*J. Blixseth Dep. at 61:2-17, Brain Dec. Ex. 3 (DKT 175-3)*).

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

The fact of the matter is that what Jessica Blixseth was told was in fact correct. There were two adverse rulings that had been entered against Timothy Blixseth by 2013. The first was a ruling that Timothy Blixseth did not have standing to challenge exculpation provisions in the YCLT reorganization plan. These provisions precluded him from asserting indemnification/contribution or damages claims against Credit Suisse for the losses claimed by Plaintiff. That ruling was ultimately reversed by the Ninth Circuit. (*See App. 2 attached hereto*). At the same time, Credit Suisse has been determined to have committed fraud in relation to other transactions occurring under circumstances virtually identical to the Yellowstone Club transactions. (*See. e.g. Claymore Decision, App. 3 attached hereto* (*Claymore Holdings, LLC v. CS, AG, Cayman Islands Branch, et al.*, In The District Court 134th Judicial District, Dallas County, Texas Cause No. DC-13-07858)).

The second was the judgment in AP 14. The AP 14 appeal is set for hearing on February 25, 2016. Isn't it the province of the finder of fact to determine whether reliance on a representation that the matters would be favorably resolved on appeal is reasonable?

Second, Plaintiff asserts that Jessica Blixseth's failure to conduct due diligence as part of the transaction by which she acquired the WAW and Kawish membership interests is an indicia of fraud. The fact of the matter is that Jessica Blixseth did not conduct any due diligence because she was already familiar with the assets and liabilities of each. (*J. Blixseth Dec. at ¶ 8 (DKT 174)).* Indeed, the whole genesis of these transactions was that Jessica Blixseth had already been paying the operating expenses for these assets. Jessica Blixseth in fact proposed the transaction in order to create a mechanism for recouping the expenditures of her separate funds she was making on behalf of DRLLLP. Jessica Blixseth was aware of the prior history of marketing of the WAW assets. Jessica Blixseth, formerly a licensed real estate agent had been involved in informal efforts to market the residence in Medina.

Plaintiff asserts as another indicia of fraud that Timothy Blixseth remained in full control of WAW and Kawish after the transfer. Plaintiff actually makes no citation to any record in support of this assertion. Presumably, this is based on the fact that Timothy Blixseth

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT – Page 11
(Cause No. 2:14-cv-01576-RAJ)

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

was identified in filings with the Secretary of State that Timothy Blixseth continued as a non-member manager.   Under Washington law, RCW 25.15.150, LLC managers "need not be members of the limited liability company or natural persons."  Jessica Blixseth testified that although Timothy Blixseth participated in management, she was a participant in any decisions relating to these assets after the membership interests were transferred.  (*J. Blixseth Dec. at ¶ 7 (DKT 174)).*  For example, Jessica Blixseth negotiated the purchase and sale agreement for the Medina Residence in late 2013 - 2014.  *Id.*

      C.    <u>Facts Relating to Reasonably Equivalent Value</u>: Plaintiff's analysis of this issue completely misses the point in two material respects.   The first question that needs to be addressed is whether the value given by Jessica Blixseth was reasonably equivalent to the value received.  To answer this question, Plaintiff would need to address the value of the membership units.  It entirely fails to do so.

      What we do know is that, at the time of the transfer, Plaintiff was attempting to extend the $41 million judgment against all of the assets of DRLLLP, all of which were membership interests in other business entities:

> In the midst of the aforesaid trial [of AP 14], the Trust became aware of the Desert Ranch Transfers and commenced a separate adversary proceeding against Desert Ranch, Mr. Blixseth, and others seeking to recover the Desert Ranch Transfers as fraudulent transfers pursuant to Sections 544(b), 548, and 550 of the Bankruptcy Code and the Montana Uniform Fraudulent Transfer Act. That action is styled Kirschner v. Desert Ranch LLLP (In re Yellowstone Mountain Club, LLC), Chapter 11 Case No. 08-61570-11, Adv. Proc. No. 10-00015 (Bankr. D. Mont., Feb. 19, 2010)[AP 15]. The complaint initiating the Desert Ranch fraudulent transfer action explicitly seeks to avoid and recover, as fraudulent transfers, the Western Air & Water ownership interests and assets Mr. Blixseth transferred to Desert Ranch.

At the same time, DRLLLP was a defendant in the action initiated by seeking to foreclose on Kawish's principal asset – the Medina residence, as well as seeking a determination as to the amount of debt which would be extinguished by the WPT membership units in *395 Lampe v Kawish,* also pending before this same court.  Lampe had initiated a non-judicial foreclosure against the Overlook lots.   At the same time, DRLLLP was the member/manager of

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT – Page 12
(Cause No. 2:14-cv-01576-RAJ)

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

Overlook Partners LLC obligated to defend *LeMond v Yellowstone Development, LLC, et al.* Montana Fifth Judicial District Court, Madison County, Case No. DV-29-2007-5.   While the tangible assets involved had a gross value of many 10's of millions of dollars, the net value was entirely a function of how all of this litigation was resolved.   Defendants would submit that under this circumstance, any value attributed to the membership interests in not just WAW and Kawish but any of the entities under the DRLLLP structure would be entirely speculative.

   As of April 2013, DRLLLP lacked the liquidity to the fund the expenses of this litigation as Timothy Blixseth testified in December 2013.   Jessica Blixseth had no ownership interest in anything relating to DRLLLP, not the membership units in WPT or the Overlook lots.   All of it was Timothy Blixseth's separate property under the Premarital Agreement.   The outcome of all this litigation would create no benefit for Jessica Blixseth.   Yet, after April 2013, Jessica Blixseth spent over $900,000 on legal fees in these actions, exclusive of any funds spent for the same purpose from the proceeds of sale of WAW assets.

   Plaintiff further asserts that the assumption of all of the WAW operating expenses should not be considered "value" arguing that anyone who buys an asset like this would assume those costs.   However, Jessica Blixseth did not purchase WAW for her personal use.   She bought WAW as an investment.   The value that anyone would realize in this circumstance is not the gross sales price.   The value would be the gross sales price net of holding costs. Jessica Blixseth's out of pocket on these expenses was over $350,000.   (*J. Blixseth Dec at ¶ 9 (DKT 174)*).

## IV. LEGAL AUTHORITY AND ARGUMENT

A.   <u>This Action should be dismissed or stayed because the same issues are being litigated in Montana where DRLLLP is a party.</u>

   This action seeks the same relief as AP 15. The rule governing duplicative actions is as follows:

> As part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit. ... The complex problems that can arise from multiple federal filings do not lend themselves to a rigid test, but require instead that the district court consider the equities of the situation when exercising its discretion.

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

Curtis v. Citibank, N.A., 226 F.3d 133, 138 (2d Cir. 2000).

The other issue is whether DRLLLP is a necessary party. Again, under Rule 19(a) the decision turns on the equities: The Court "shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." The Court can consider many factors to decide whether, "in equity and good conscience," the case can proceed without the absent party. *Paiute–Shoshone Indians of Bishop Cmty. of Bishop Colony, Cal. v. City of Los Angeles*, 637 F.3d 993, 1000 (9th Cir.2011).

Plaintiff's First Cause of Action alleges that DRLLLP is an initial transferee from Timothy Blixseth. Plaintiff alleges that JTB is a subsequent transferee from DRLLLP. Defendants were unable to locate authority under either Washington's or Montana's version of the Uniform Fraudulent Transfer Act holding that the initial transferee is a necessary party to an action to avoid a transfer to a subsequent transferee.[2] However, there is authority holding that, in order to recover from a subsequent transferee the trustee must first avoid the transfer of the debtor's interest to the initial transferee under 11 USC § 548 making the initial transferee a necessary party to the avoidance action against the subsequent transferee. In re Slack-Horner Foundries Co., 971 F.2d 577, 580 (10th Cir. 1992)(explaining that "in order to recover from a subsequent transferee the trustee must first have the transfer of the debtor's interest to the initial transferee avoided").

In considering the equities involved, the Court should consider that these issues have been pending in Montana for now almost six years and has been extensively litigated. The Docket in AP 15, *attached hereto as App. 4*, has 364 entries. Defendants here have had no involvement in any of it.

It should be obvious that Plaintiff is attempting to obtain a result here against Defendants whose capacity to defend the claims is minimal (*see Brain Dec. (DKT 175)*) in order to avoid

---

[2] Again, if JTB LLC is the initial transferee from DRLLLP, there has been no subsequent transfer because the membership interests remain vested in JTB. Likewise, Jessica Blixseth cannot be a subsequent transferee from JTB because the membership interests remain vested in JTB.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT – Page 14
(Cause No. 2:14-cv-01576-RAJ)

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

trying the case in Montana against counsel who have been involved in the case for years. Plaintiff is making an end run on AP 15 in Montana after the matter has been referred to the District Court for trial.

It is hard to avoid the conclusion that Plaintiff is asserting the claim here without DRLLLP in order to obtain a judgment to support a collateral estoppel under circumstances where DRLLLP is not a party and cannot defend itself. Moreover, it is pretty clear that Defendants, having had no involvement in the transactions at issue or in the extensive litigation, are simply not in a position to effectively litigate these claims.

     B.    <u>There are material issues of fact on the issue of good faith.</u>

The parties agree as to the controlling standard here:

> At least one court has held that if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a *diligent* inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent. *In re Polar Chips Int'l., Inc.,* 18 B.R. 480 (Bankr.S.D.Fla.1982). Courts have been candid in acknowledging that good faith "is not susceptible of precise definition." *In re Roco Corp.,* 701 F.2d at 984.

<u>In re Agric. Research and Tech. Group, Inc.,</u> 916 F.2d 528, 536 (9th Cir. 1990). However, before you get to the issuer of good faith, there has to be a fraudulent basis to discover. Defendants contend that there are issues of fact as to a fraudulent purpose.

In this regard, Plaintiff contends that the purpose of the transaction was to conceal or protect the membership interests in WAW and Kawish from Plaintiff's claims. However, the testimony by Jessica Blixseth was:

> The Agreement between JTB and DRLLLP by which JTB purchased the assets of Western Air & Water, LLC ("WAW") was effective April 3 2013. The ultimate purpose JTB's acquisition was to provide funding to DRLLLP to prevent the loss of assets. DRLLLP did not have the liquidity to pay the ongoing expenses of related to the assets …. and was facing the loss of the assets.

(*J. Blixseth Dec. at ¶ 2; (DKT 41)).* *Timothy* Blixseth said exactly the same thing in his Deposition at pgs. 302-306 (*Brain Dec. Ex. 4 (DKT 175-4)).* Plaintiff offers no evidence to the contrary. Jessica Blixseth went on to state: "In addition, DRLLLP was engaged in litigation over other assets of considerable value." (*J. Blixseth Dec. at ¶ 2; DKT 41).* It is these litigation

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT – Page 15
(Cause No. 2:14-cv-01576-RAJ)

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

expenses relating to among other things, all the Prim litigation, *LeMond*, AP 15 etc. which Jessica Blixseth testified she agreed to pay as part of the transaction.  (*J. Blixseth Dep. at 57:5-59:9; Brain Dec. Ex. 5 (DKT 175-5)*).

While Plaintiff contends that the testimony regarding what Jessica agreed to pay is inconsistent, the actual post April 2013 payment history is quite clear.  Jessica Blixseth paid over $900,000 to lawyers (*J. Blixseth Dec. at ¶ 10 and Ex. 2 (DKTS 174 and 174-2)*) all of whom were providing services to DRLLLP and not Jessica Blixseth. (*Brain Dec. Ex. 5 (DKT 175-5)*). From these facts, a finder of fact could reasonably infer that the purpose of the transaction was wholly legitimate – to provide funding to DRLLLP to protect its position in this litigation.

In terms of the issue of good faith itself, much of Plaintiff's evidence relates to events occurring either before Mrs. Blixseth was Mrs. Blixseth and in which Mrs. Blixseth had no involvement or, in October 2014.  The latter is immaterial to the issue because "good faith" is measured as of the time of transfer; <u>In re O'Connell</u>, 119 B.R. 311, 317 (Bankr. M.D. Fla. 1990), in this case, April of 2013, not October of 2014.  The former appears to be offered to bolster Plaintiff's basic contention.  This evidence boils down to Jessica Blixseth was married to Timothy Blixseth and:

> You can't play in mud and not get dirty.  That's what she's done.  She's played in his mud pile, and she's dirty because of it.

(*Glasser Dep. at 61, Brain Dec. Ex. 2 (DKT 175-2)*).  Plaintiff's evidence is then, that Mrs. Blixseth became Mrs. Blixseth plus: the disputed contention that Jessica Blixseth attended some unspecified portion of the Phase 2 AP 14 trial;[3] the contention that Jessica Blixseth read some press reports, the contents of which are unknown; the disputed contention that Jessica Blixseth went forwards with the transaction without being educated about the assets she

---

[3] Even if Mrs. Blixseth had been aware of the judgment, that fact by itself is insufficient to trigger a duty of disclosure. "Mere knowledge by a grantee of pre-existing judgments against the grantor does not constitute "knowledge of facts and circumstances naturally and justly calculated to excite suspicion in the mind of a person of ordinary prudence, and which would naturally prompt [the grantee] to pause and inquire about consummating the transaction...." 37 C.J.S. *Fraudulent Conveyances* § 126, at 957 (1943)." <u>Fick v. Perpetual Title Co.</u>, 115 Md. App. 524, 544, 694 A.2d 138, 148 (1997).

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

1   was acquiring; and, the unsubstantiated contention that Timothy Blixseth remained in sole

2   control of the assets after the transaction (again outside the relevant time frame).  In light of the

3   Premarital Agreement even the contention that Jessica Blixseth was an insider with inside

4   "confidential" information, where both testify that Timothy Blixseth did not share information

5   about his financial affairs is without support.  This is not a summary judgment issue on this

6   record.

7        C.   There are material issues of fact on reasonable equivalence.

8        The standard governing reasonable equivalence is non-controversial:

9        [R]easonably equivalent value is a case by case issue of fact that depends upon
         the circumstances of the transfer.

10
11   In re Heilig-Meyers Co., 297 B.R. 46, 52 (Bankr. E.D. Va. 2003).

12        Reasonable equivalence does not require exact equality of value, but rather must
         be approximately or roughly equivalent, and is fundamentally a question of
13        common sense. However, "[t]he common thread expressed in the case law
         instructs that the Court must have a quantifiable basis for its valuation, although
14        the information available to the Court need not be precise." The Court needs at
         least "some rough or approximate understanding of the financial value of the
15        transfer so that it can analyze the effect of avoidance of the transfer on funds
         available to the debtor's estate." Further, indirect benefits to the debtor, as well as
16        direct benefits, may constitute value if sufficiently concrete and identifiable.
         "Beyond looking at what is exchanged in a *quid pro quo* transaction, it is
17        important to examine the value of all benefits inuring to a debtor by virtue of the
         transaction in question, directly or indirectly."
18

19   In re Floyd, 540 B.R. 747, 758 (Bankr. D. Idaho 2015)(Citations omitted).

20        Perhaps the most glaring problem here is that Plaintiff makes no effort to establish what

21   the value of the membership units was to measure against the direct and indirect benefits

22   conferred by the transaction to determine reasonable equivalence.  Even if the Court finds that

23   the transaction conferred no benefits on DRLLLP there is no basis for determining a lack of

24   equivalence.  Under the circumstances that all of DRLLLP's significant assets were involved in

25   litigation in addition to the judgments entered on behalf of Plaintiff and the pendency of AP 15,

26   this Court could use its "common sense, measured against market reality;" In re Schultz, 368

27

28

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT – Page 17
(Cause No. 2:14-cv-01576-RAJ)

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

B.R. 832, 836 (Bankr. D. Minn. 2007), and take judicial notice that these membership interests had no market value of any kind.

From there, Plaintiff's value argument simply ignores the principal **direct** benefit conferred by the transaction, the payment of in excess of $900,000 of legal expenses on behalf of DRLLLP which DRLLLP otherwise did not have the resources to fund.  This was not an "unperformed" promise.

Plaintiff further asserts that the assumption of all of the WAW operating expenses should not be considered "value" arguing that anyone who buys an asset like this would assume those costs.  However, Jessica Blixseth did not purchase WAW for her personal use.  She bought WAW as an investment.  The value that anyone would realize in this circumstance is not the gross sales price.   The value would be the gross sales price net of holding costs. Jessica Blixseth's out of pocket on these expenses was over $350,000.  (*J. Blixseth Dec at ¶ 9; (DKT 174)*).  Moreover, relieving DRLLLP of these obligations was an indirect benefit this Court is entitled to consider under the applicable standard.

## V. CONCLUSION

If this Court concludes that this Action should not be dismissed or stayed because a necessary party has not been joined and the First Cause of Action is duplicative of AP 15, it should nevertheless deny summary judgment because of numerous issues of material fact.

DATED this 11th day of January, 2016.

BRAIN LAW FIRM PLLC

By: _____
Paul E. Brain, WSBA #13438
Counsel for Defendants

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT – Page 18
(Cause No. 2:14-cv-01576-RAJ)

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

## CERTIFICATE OF SERVICE

I, Kim Middleton, declare as follows:

1.      I am a citizen of the United States, over the age of 21 years, and I am not a party to the above-entitled action. I am competent to be a witness. Pursuant to Fed. R. Civ. P. 5(b) and RCW 9A72.085,

2.      I certify that on the 11th day of January, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**Kevin W. Barrett (Pro Hac Vice) on behalf of Trustee:**
kbarrett@baileyglasser.com

**William A. Kinsel on behalf of Plaintiff:**
wak@kinsellaw.com

**Ora N. Nwabueze on behalf of Plaintiff:**
ONwabueze@baileyglasser.com

**Russell M. Soloway:**
rsoloway@baileyglasser.com

3.      I certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants

[none]      ____
            ____

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED this 11th day of January, 2016, at Tacoma, Washington.

_Kim Middleton_

Kim Middleton

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT – Page 19
(Cause No. 2:14-cv-01576-RAJ)